**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JANTZEN VERASTIQUE, DONDI MORSE, PARKER NEVILLS, YOLANDA DOBBINS, DAVID BAKER (AKA DABI BAKER), and MAGGIE LITTLE,** | § § § § § § | |
| | § | **Civil Action No. 3:22-cv-1182** |
| *Plaintiffs*, | § § | |
| **v.** | § § | |
| **CITY OF DALLAS, DALLAS COUNTY, DALLAS COUNTY SHER-IFF's OFFICE, and ROGER A. RUD-LOFF, RUSSELL BARRETT, CHINH WELTMAN, DAVID PILLAR, AND THOMAS HOFFMAN individually and in their official capacities as a Dallas Police Department Police Officers,** | § § § § § § § § § § | **JURY TRIAL DEMANDED** |
| *Defendants*. | | |

## PLAINTIFFS' COMPLAINT

Plaintiffs JANTZEN VERASTIQUE, DONDI MORSE, PARKER NEVILLS, YOLANDA DOBBINS, DAVID (A/K/A DABI) BAKER, AND MAGGIE LITTLE ("Plaintiffs") bring this action for damages and all other legal and equitable relief from: the CITY OF DALLAS, TEXAS ("THE CITY"); DALLAS COUNTY, TEXAS; DALLAS COUNTY SHERIFF'S OF-FICE; AND SERGEANT ROGER A. RUDLOFF, SENIOR CORPORAL RUSSELL BARRETT, SENIOR CORPORAL CHINH WELTMAN, DAVID PILLAR AND THOMAS HOFFMAN in-dividually and in their official capacities as Dallas Police Department ("DPD") police officers, for violations of Plaintiffs' rights under the United States Constitution, including violations of the First Amendment in violation of 42 U.S.C.A § 1983, excessive force under the Fourth Amendment in violation of 42 U.S.C.A § 1983, unlawful arrest under the Fourth Amendment in violation of

U.S.C.A § 1983, failures to discipline in violation of 42 U.S.C.A § 1983, denial of basic human needs under the Fourteenth Amendment in violation of U.S.C.A § 1983, failures to discipline in violation of 42 U.S.C.A § 1983, failures to adopt policies or train in violation of U.S.C.A. § 1983, violations of the Texas Tort Claims Act, and any other cause(s) of action that can be inferred from the facts set forth herein.

## INTRODUCTION

1.    This is an action brought by Plaintiffs against Defendants for acts of unlawful arrest, excessive force, inadequate training, failure to adopt policies, and denial of basic human needs that led Plaintiffs to suffer emotional harms, bodily injuries, and constitutional deprivations. Defendants acted under the color of law and violated Plaintiffs' individual rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution, and civil rights under 42 U.S.C § 1983, as well as the Texas Tort Claims Act.

2.    On May 30, 2020, following the murder George Floyd, Plaintiffs participated in peaceful protests against police misconduct throughout the City of Dallas.

3.    Defendants subjected Plaintiffs, as lawful protestors, to unlawful arrests and excessive force in violation of Plaintiffs' constitutional rights. Defendants ignored Plaintiffs' and other protesters attempts to remain peaceful and comply with officer directions, instead punishing Plaintiffs merely their presence at the protests, not their actions.

4.    Defendants unlawfully used the color of law to crush protected expression that was critical of them. Defendants discriminately employed vaguely-worded laws to falsely arrest protestors, using excessive force in the process. Defendants subjected Plaintiffs to criminal charges without probable cause as Plaintiffs did not participate in any unlawful activity. Defendants jailed Plaintiffs overnight at the Dallas County Jail on the basis of their presence at protests, and disregarded Plaintiffs' basic human needs.

5.      Defendant City of Dallas' lack of policies to prevent such constitutional violations, failure to train on constitutional operations, and unconstitutional mass arrest policies were the moving force behind the Defendant Police Officers deprivations of Plaintiffs' constitutional rights.

6.      Defendants Dallas County's and Dallas County Sheriff's Office's custom or practice of unconstitutional care policies was the moving force behind the unconstitutional treatment Plaintiffs suffered while at the Dallas County Jail.

7.      As a result of Defendants' unlawful actions, Plaintiffs are entitled to injunctive relief to prevent future violations of their rights under the United States Constitution, including protections against unreasonable searches and seizures under the Fourth Amendment; deprivation of rights under 42 U.S.C.A. § 1983; and any other cause(s) of action that can be inferred from the facts set forth herein.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to: (i) 28 U.S.C.A § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States; (ii) 28 U.S.C.A § 1343(a)(3), which confers original jurisdiction upon this Court in any civil action to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and 28 U.S.C.A § 1343(a)(4), which confers original jurisdiction upon this Court in any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

9.      The Court's supplemental jurisdiction is invoked by 28 U.S.C.A § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of

operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in this Court under 28 U.S.C.A § 1391(b)(1) because on information and belief all Defendants are residents of the State of Texas and each of the institutional Defendants, and on information and belief a number of the individual Defendants, resides in this judicial district and under 28 U.S.C.A § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## **PARTIES**

11.     Jantzen Verastique (she/her pronouns) was a lawful and peaceful protestor within the City of Dallas during the George Floyd protests on May 30, 2020; and is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas.

12.     Dondi Morse (she/her pronouns) was a lawful and peaceful protestor within the City of Dallas during the George Floyd protests on May 30, 2020; and is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas.

13.     Parker Nevills (he/him pronouns) was a lawful and peaceful protestor within the City of Dallas during the George Floyd protests on May 30, 2020; and is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas.

14.     Yolanda Dobbins (she/her pronouns) was a lawful and peaceful protestor within the City of Dallas during the George Floyd protests on May 30, 2020; and is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas.

15.     David Baker (she/her pronouns) is the legal name of the plaintiff whose preferred name is Dabi Baker, which will be used henceforth in this Complaint. Dabi Baker was a lawful and peaceful protestor within the City of Dallas during the George Floyd protests on May 30, 2020;

and is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas.

16. Maggie Little (she/her pronouns) was a lawful and peaceful protestor within the City of Dallas during the George Floyd protests on May 30, 2020; and is and has been, at all relevant times, a citizen of the United States of America and is a resident of the State of Texas.

17. The City of Dallas is a local governing home-rule municipality under Tex. Local Gov't Code Chapter 9, and is located in Dallas, County, Texas. The City of Dallas operates under the City Charter, and funds and operates the Dallas Police Department under its charter as a home-rule municipality pursuant to Tex. Local Gov't Code § 341.003. Under the Dallas City Charter, the Dallas Chief of Police is delegated with official final policymaking authority to control, establish, operate, regulate, and promulgate all final policies for governing the Dallas Police Department, in accordance with Dallas City ordinances. In addition, the Dallas Chief of Police is delegated with the authority for the implementation of the policies, procedures, practices, and customs, as well as the acts and omissions of its law enforcement officers based on the training and discipline of each law enforcement officer. The City of Dallas is within the Northern District of Texas, Dallas Division.

18. Dallas County is a local governing municipality within Texas that funds the Dallas County Sherriff's Office and is within the Northern District of Texas.

19. Dallas County Sherriff's Office is a local law enforcement entity funded by Dallas County and within Dallas County, Texas. Dallas County Sherriff's Office establishes, operates, and supervises all final official policies regarding law enforcement for the Dallas County Jail, independently and without Dallas County supervision. Dallas County Sherriff's Office establishes and supervises all final official policies, actions, and customs of the Detention Officers and

employees at the Dallas County Jail. Dallas County Sheriff's Office is responsible for the implementation of the Jail budget, policies, procedures, practices and customs, as well as the acts and omissions of its detention officers and employees based on the training and discipline of each detention officer and employee. Dallas County Sheriff's Office is within the Northern District of Texas

20.     Sergeant Roger A. Rudloff (#7267) is a supervisory law enforcement officer with the City of Dallas, and operates within the Dallas Police Department. Sgt. Rudloff is sued in his individual and official capacity. At all relevant times, Sgt. Rudloff was acting under the color of law as a Dallas Police Department Police Officer supervising and in coordination with other Dallas Police Department Police Officers.

21.     Senior Corporal Russell Barrett (#8593) is a supervisory law enforcement officer with the City of Dallas, and operates within the Dallas Police Department. Senior Corporal Barrett is sued in his individual and official capacity. At all relevant times, Senior Corporal Barrett was acting under the color of law as a Dallas Police Department Police Officer supervising and in coordination with other Dallas Police Department Peace Officers.

22.     Senior Corporal Chinh Weltman (#10279) is a supervisory law enforcement officer with the City of Dallas, and operates within the Dallas Police Department. Senior Corporal Weltman is sued in his individual and official capacity. At all relevant times, Senior Corporal Weltman was acting under the color of law as a Dallas Police Department Police Officer supervising and in coordination with other Dallas Police Department Police Officers.

23.     Senior Corporal David Pillar (#8786) is a supervisory law enforcement officer with the City of Dallas, and operates within the Dallas Police Department. Senior Corporal Pillar is sued in his individual and official capacity. At all relevant times, Senior Corporal Pillar was acting

under the color of law as a Dallas Police Department Police Officer supervising and in coordination with other Dallas Police Department Police Officers.

24.     Thomas Hoffman (#11613) is a law enforcement officer with the City of Dallas, and operates within the Dallas Police Department. Thomas Hoffman is sued in his individual and official capacity. At all relevant times, Thomas Hoffman was acting under the color of law as a Dallas Police Department Police Officer supervising and in coordination with other Dallas Police Department Police Officers.

## STATEMENT OF FACTS

**A.  Defendant Rudloff assaulted Plaintiff Jantzen Verastique with a PepperBall gun shortly before Defendants Rudloff, Weltman, Pillar, and Hoffman unconstitutionally arrested Plaintiffs Verastique, Morse and Nevills.**

25.     On May 30, 2020, Plaintiffs Verastique, Morse and Nevills were protesting in Dallas, Texas, in response to the murder of George Floyd in Minneapolis, Minnesota, in remembrance of other unarmed Black people who were killed by police officers under circumstances that led to the officers being charged with murder, and against Police misconduct within the United States. Three cases relevant towards the protests occurred in the Dallas-Fort Worth metroplex: the murder of Jordan Edward and the murder of Botham Jean, both of which resulted in convictions prior to the protests, and the murder of Atatiana Jefferson, which has not yet gone to trial.

26.     People began protesting across the country after George Floyd's murder.[1] As early as May 27, nationally televised protests were organized in most major cities with issues related to police misconduct, including Memphis, Los Angeles, St. Louis, and Chicago.[2] On May 29,

---

[1] Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. TIMES (Nov. 5, 2021) https://www.ny-times.com/article/george-floyd-protests-timeline.html.
[2] *Id.*

demonstrations in Atlanta, New York City, Washington, D.C., and Detroit led to injuries and mass arrests.[3] Protests also began in Dallas on May 29, 2020.

27.     Beginning on May 29, 2020. the Dallas Police Department ("DPD"), on behalf of Defendant City of Dallas, Defendant Dallas County, and Defendant Dallas County Sheriff's Office policed the Dallas protests with their law enforcement officers, including Defendants Rudloff, Barrett, Weltman, Pillar and Hoffman.

28.     Based on the extensive news coverage and other information and belief, when Defendants were engaged in policing in downtown Dallas on May 30, 2020, Defendants were aware of the nationwide protests covered by national news organizations, and were aware of the ongoing protests in the city of Dallas. Upon information and belief, Defendants were also aware that the protests were likely to continue and were aware that criticism of policing in the United States would be the continued focus of the protests.

29.     While Plaintiffs Verastique and Morse were marching onto Reunion Boulevard in the direction of Interstate 35, Defendants were closing off streets to make the route for peaceful protestors smaller and smaller until virtually the only place the protestors could go was onto the highway. However, Plaintiffs Verastique and Morse did not walk onto the highway and walked across a grassy slope towards downtown Dallas.

30.     As Plaintiffs Verastique and Morse walked across the grassy slope, they noticed a Black woman crying out from the ground. Several other Black protesters went to the woman's aid, as captured in the picture below.

---

[3] Id.



31.     As the good Samaritans helped the woman to her feet, Defendants stormed them, threw them to the ground, and began unlawfully arresting peaceful protestors without probable cause. Defendants' aggression thereby transformed the peaceful scene into a violent exchange.

32.     A photojournalist named Chris Rusanowsky, a plaintiff in a separate lawsuit, documented Defendants' behavior on camera; and body cameras worn by Defendants Weltman and Pillar further documented Defendants' unlawful actions.

33.     Defendants specifically used excessive force against the peaceful protestors and arrested them without probable cause, despite the fact that the peaceful protestors complied with Defendants' instructions, including actions to halt and place their hands in the air.



34.     Plaintiffs Verastique and Morse did not interfere with Defendants' actions, but were shocked by  Defendants' conduct and feared for the Samaritans' safety. Plaintiff Verastique tried to explain to Defendants that there was no probable cause for their actions by yelling, "Stop! Hold on! Stop! They didn't do anything!"

35.     Upon hearing these words, Defendant Rudloff immediately turned his attention to Verastique and aggressively advanced towards her with a rifle aimed at her chest. Defendant Rudloff's conduct was so extreme that it drew the attention of a motorist bystander who began recording Defendant Rudloff's actions.

36.     Defendant Rudloff subsequently ordered Verastique to stop and place her hands in the air. Verastique immediately complied, and remained a lawful peaceful protester. Despite Verastique's compliance, Defendant Rudloff unreasonably shot her at close range for no objective or lawful reason. Rusanowsky captured Verastique recoiling in immense pain from Defendant Rudloff's use of force.



     37.    The motorist bystander further captured Defendant Rudloff hovering over Verastique as she collapsed to the ground screaming, "I can't breathe."



38.    After Verastique collapsed, Defendant Rudloff then pointed his weapon at Plaintiff Morse, who was also standing still with her hands raised above her head, and remained a lawful peaceful protestor. Defendant Rudloff exclaimed, "You are under arrest! Get on the ground!" He then hovered over Verastique, repeating the same words, "You are under arrest. Get on the ground." Defendant Rudloff failed to provide any probable cause or basis for his commands and there was no attempt to provide medical assistance to Verastique as she yelled out in pain.

39.    As Defendant Rudloff began indiscriminately throwing people to the ground, pointing his weapon, and unreasonably shooting people, Plaintiff Nevills feared Defendant Rudloff was using a weapon with lethal force, and feared that Defendant Rudloff would continue using deadly force against anyone in the area.

40.    Nevills then ran towards Verastique hoping to render aid. Defendant Barrett fired PepperBalls at Nevills feet to stop Nevills from rendering aid. Defendant Barrett also used further

excessive force by firing rounds at Nevills in his stomach. At this time, Defendant Barrett was not authorized by the DPD to carry a pepper-ball gun because he was not certified to carry the weapon. DPD procedures did not stop Defendant Barrett from using the chemical weapon on the day of protests.

41.     As a result of Defendants' excessive force, Nevills stopped advancing towards Verastique. Defendant Rudloff and DPD Officer Travis Marshall then advanced towards Nevills and detained him. Defendant Weltman's body-worn camera recorded Defendant Rudloff dropping his PepperBall gun on the ground, unholstering his stun gun, pointing it at Nevills, and placing him under arrest without probable cause.

42.     Defendant Rudloff then told Nevills he was under arrest for "disorderly conduct," despite Nevills voluntarily placing his hands behind his back, and only peacefully protesting. While Nevills was standing still with his hands behind his back, Defendant Rudloff unreasonably kneed Nevills in the groin area for no apparent reason and without any objective purpose.

43.     Defendant Rudloff , then grabbed Nevills by the hair and forced him to the ground in coordination with Defendant Weltman and Officer Marshall.



44.    Plaintiffs Verastique's, Morse's, and Nevills' arrests resulted, in part, from a lack of training regarding the policing of protests, a deliberate indifference by DPD to discipline police officers who would violate constitutional rights, and an unconstitutional mass arrest policy under DPD General Order 609.00.

45.    Plaintiffs Verastique, Morse, and Nevills were not read their Miranda warnings after being placed under arrest. Despite this fact, DPD officers custodially interrogated each of them. The officers' conduct and statements in the course of these interrogations further betrayed the lack of any basis for having assaulted and arrested Plaintiffs.

46.    For example, despite that Defendant Pillar had no knowledge of what activities Verastique and Morse were involved with prior to placing them in restraints, he criticized them for protesting. Defendant Pillar acknowledged that although he did not see them on the highway, but

that he and other DPD officers were simply operating under the assumption that Plaintiffs and other peaceful protestors had been on the highway.

47.    Defendant Pillar then walked Rusanowsky to a DPD police vehicle for transportation to the Dallas County Jail ("the Jail") while Defendant Weltman transported Plaintiffs Verastique and Morris.

48.    Once Defendant Weltman was outside the earshot of Defendant Pillar, she too began interrogating Verastique and Morris by saying, "I heard that other officer having some words with y'all, but I'm just letting y'all know we don't care about peaceful protests."

49.    Defendant Weltman went on to explain that Verastique and Morris were being arrested because an unidentified person threw something at an officer. When Verastique and Morris told her they did not throw anything and were not around anyone else who did, Defendant Weltman admitted, "I don't know exactly who did." Defendant Weltman also spontaneously exclaimed, "I was not that officer that kneeled on that man and killed him!," apparently referring to Derek Chauvin murdering George Floyd.

50.    Defendant Weltman's words evidenced the wanton disregard for Plaintiffs' constitutional rights throughout the protests, and in conducting unlawful mass arrests.

51.    While escorting Verastique and Morris, Defendant Weltman encountered Plaintiff Yolanda Dobbins and assisted with her arrest by searching her.

**B. Though Plaintiff Yolanda Dobbins was arrested in a different area from Plaintiffs Jantzen, Verastique, and Nevills and under different circumstances, the arresting officer Defendant Hoffman's arrest report falsely claims Plaintiff Dobbins acted in concert with the other Plaintiffs and another Plaintiff: Maggie Little.**

52.    During the day of the protests, Plaintiff Yolanda Dobbins had accompanied her teenage daughter to a march near Interstate 35E.

15

53.    After Defendants began closing roads limiting the route that protestors could follow, Dobbins and her daughter followed a group of peaceful protestors who started walking towards the highway, which was the only path they could follow.

54.    Neither Dobbins nor her daughter stepped foot on the highway. As they were walking, the Defendants arrived and began firing chemical projectiles into the crowd.

55.    Dobbins and her daughter were then separated by Defendants' actions as Dobbins' daughter attempted to run from the chemical projectiles. As they were separated, Dobbins witnessed a DPD squad car use deadly force in an attempt to ram her daughter.

56.    Ms. Dobbins screamed out of fear for her daughter, which caused DPD officers to surround Dobbins and arrest her without probable cause.

57.    As Dobbins was being arrested, she asked the DPD officers to check if her minor daughter was physically safe and/or alive. The DPD officers refused and told her that if Dobbins wanted her daughter to be safe "she should have thought of that before coming to protest." Defendant City of Dallas' officers' words further evidenced the wanton disregard for Plaintiffs' constitutional rights throughout the protests, and the unlawful nature of their mass arrests.

58.    Dobbins did not learn that her daughter was safe and with family until she was released from the custody of Defendants.

59.    DPD officers then placed Dobbins in restraints and sat her in a DPD van until a female DPD officer could search her. At that point, Dobbins came into contact with Defendant Weltman.

60.    Dobbins asked Defendant Weltman, "So just because we was in this area, that's why we got arrested?" Defendant Weltman responded that she did not know why Dobbins was arrested but indicated that Plaintiffs Verastique and Morris were arrested because unidentified

people went onto the freeway and threw objects, explaining, "When it comes to that, we start making arrests," indicating that like Dobbins, Plaintiffs Verastique and Morris were arrested without probable cause.

61.    As Defendant Weltman explained that "everyone" was going to jail, she admitted that the court "might just drop it," acknowledging that Defendants planned to initiate criminal proceedings against Plaintiff without probable cause and absent a just purpose.

62.    During this conversation, an unidentified DPD sergeant overheard Dobbins state, "I work for the Dallas County Hospital District." The sergeant interjected and asked in an accusatory tone, "Then why were you down here?!"

63.    Nearby, as Defendant Pillar helped inventory Rusanowsky's equipment, he and another DPD officer acknowledged that protestors were being arrested and charged without probable cause.

64.    The unidentified DPD officer explained, "They've been doing like big chain reports…I don't know what they're going to want to do with this." Defendant Pillar responded, "I don't have the slightest clue either." Upon information and belief, the unidentified DPD officer was referring to a big chain report under DPD General Order 609.00.

## C. The arrests of Plaintiffs Maggie Little and Dabi Baker further prove that peaceful protestors were being arrested indiscriminately and without probable cause.

65.    Plaintiffs Maggie Little and her partner Dabi Baker were subsequently arrested for peacefully protesting, despite the fact that they never reached any of the main protest sites due to continual redirection by Defendants with the use of force, including the use of teargas..

66.    Eventually DPD officers forced Plaintiffs Baker and Little into a parking garage near Main Street Garden Park and  refused to let them leave. DPD Officers subsequently became

frustrated with Baker and Little's repeated requests for their names and badge numbers, slammed Baker to the ground, and beat her; thereby causing significant bodily injuries.

67.    DPD officers slammed Baker to the ground with such force that they broke her glasses, which cut into the bridge of her nose. Additionally, Plaintiff Baker suffered severe injuries to her chest.

68.    As DPD officers took Baker and Little into custody, the Plaintiffs asked what they were being arrested for and were told, "It'll be on the police report." Although Baker was injured, DPD officers refused to provide medical attention.

69.    DPD officers spent roughly two hours rounding up other peaceful protestors. Throughout this time, DPD officers refused to take Plaintiff Baker to the hospital, and instead released Plaintiff Baker.

70.    Upon information and belief, Defendant City of Dallas' unconstitutional failure to train officers interacting with protesters, rules of engagement, and unconstitutional mass arrest procedures in advance of and during this nationally significant weekend of widespread protests empowered the Defendant Officers to arrest Plaintiffs without probable cause, and use excessive force.

**D.  DPD officers and Defendant Dallas County Sheriff's Office's deputies continued mocking protestors and harassing them as their were transferred to the Dallas County Jail.**

71.    Following the unlawful arrests, Plaintiffs were placed in crowded trucks and held for an extended period of time without any COVID-19 precautions before being transported.

72.    Plaintiffs were ultimately taken to jail and detained overnight in unsanitary and dangerous conditions.

73.    While incarcerated by Defendant Dallas County and Dallas County Sheriff's Office, Plaintiff Dobbins asked for a cup of water due to suffering from dehydration.

74.     A detention officer whose name is unknown denied her request, and told her "You should have thought about that before you came down here [to protest]" in an attempt to punish Plaintiff Dobbins for her status as a pretrial detainee.

75.     Plaintiff Verastique sought medical attention for her serious injuries including bruising and exposure to chemical irritants from the pepper ball chemical weapon. At this time, Plaintiff Verastique was suffering substantial pain and continued difficulties breathing.

76.     However, the employees at the jail refused to offer Plaintiff Verastique any medical attention or any treatment, and ignored Plaintiff Verastique's continued complaints for basic medical attention. Instead, the jailers were overheard laughing at Plaintiff Verastique's medical needs, thereby punishing Plaintiff Verastique and other Plaintiffs for their status as pretrial detainees.

77.     The experiences of the Plaintiffs at the jail were a common experience that night as there were reports of numerous people bleeding, struggling to breathe, bruised, battered, and in dire need of medical attention.

78.     Upon information and belief, none of the jail staff provided any response to the obvious basic medical needs of the persons within their custody. Instead, the jailers wantonly ignored these needs to punish the detainees and express contempt for them.

79.     As of this time, there has been no disciplinary action taken against the officers at the jail for denying Plaintiffs' basic human needs.

**E. Information provided by the DPD and the Dallas District Attorney's Office is inconsistent and indicates Plaintiffs were arrested and charged without probable cause.**

80.     The Dallas District Attorney's Office began contacting Plaintiffs after the Dallas Morning News wrote an article about Plaintiff Verastique's assault on August 9, 2020.[4] This led to the Dallas Police Department's Public Integrity Unit ("PIU"), on behalf of Defendant City of Dallas, contacting Plaintiffs as well. The PIU interviewed Plaintiffs individually in September of 2020, and investigated their cases for DPD misconduct.

81.     In the process, Plaintiffs discovered that the DA's office and PIU had inconsistent information regarding the basis for Plaintiffs' May 30, 2020 arrests under the DPD's mass arrest procedures.

82.     The DA's Office told Verastique that she was arrested for obstruction of a roadway while PIU maintained she was arrested for riot participation.

83.     The PIU told Morse that she was arrested for riot participation while a spreadsheet released by the DPD pursuant to a public records request indicated that she was arrested for obstructing a roadway. This discrepancy is notable because it indicates that the information for Morse was not consistent despite coming from the same source, the DPD.

84.     The DA's Office and PIU told Nevills that he was arrested for obstruction of a roadway while his arrest report accused him of riot participation.

85.     The DA's Office told Dobbins that she was arrested for obstruction of a roadway while PIU maintained she was arrested for riot participation. Dobbins' arrest report maintained she was arrested for riot participation as well.

---

[4] Miles Moffeit & Cassandra Jaramillo, *I felt like my chest was on fire': Photo shows Dallas police officer shooting protester with pepper-ball gun*, THE DALLAS MORNING NEWS (Aug. 9, 2020) https://www.dallasnews.com/news/investigations/2020/08/09/i-felt-like-my-chest-was-on-fire-photo-shows-cop-blasting-a-peaceful-protester-with-a-pepper-ball-gun-at-close-range/

86.    Only Plaintiff Little's charging information was consistent, but inaccurate. Little was charged with riot participation; however, she was protesting with Plaintiff Baker away from any major areas of protest. Two individual peaceful protestors cannot be charged with rioting under Texas law.

87.    Though Little was arrested, neither PIU nor DPD officials have clarified thus far what she was arrested for.

88.    During the investigation of Nevills' complaint against the DPD officer who arrested him, he learned that DPD formally dropped charges against him roughly two weeks after his arrest for the following reasons: "Due to insufficient evidence. Due to the large crowds and detaining groups at a time, transporting officers were unable to identify who the arresting officers were."

89.    Subsequently, all charges against Plaintiffs were dropped roughly two weeks after their arrests, and thus, ended all of Plaintiffs' criminal proceedings without a conviction. The DA and PIU confirmed that all charges against each Plaintiff were dismissed for similar reasons.

90.    Upon information and belief, the charges initiated against Plaintiffs were dropped because Defendants instituted criminal charges without any probable cause in order to punish Plaintiffs for attending the protests, rather than bringing Plaintiffs to justice.

91.    The widespread institution of charges without probable cause during DPD's mass arrests was a failure of DPD's mass arrest procedures at the time, specifically DPD General Order 609.00.

92.    DPD General Order 609.00 fails to include a requirement that charges resulting from mass arrests are bound by sufficient probable cause; instead it only requires that arrests be approved by a supervisor from the DPD Patrol Division Investigative Unit.

93.     Plaintiffs did not learn about their dropped charges until after they filed complaints against their arresting officers. The initiation of the legal charges brought injury to the Plaintiffs through damaging their reputations and assigning unfounded wrongs to their character.

94.     Because Plaintiffs were not informed that charges were dropped, they were forced to retain lawyers and avoided participating in protests for fear of being rearrested by violating the conditions of their bonds; and, thus, were forced to endure fear of further false imprisonment.

95.     Upon information and belief, no disciplinary action has been taken by the DPD, on behalf of Defendant City of Dallas, towards the widespread institution of legal charges without probable cause.

**F.  Aftermath and Investigation: Defendant Rudloff's History of Complaints and Defendant City of Dallas' Failure to Supervise and Discipline Officers**

96.     Numerous news outlets covered the protests, including Defendant Rudloff's conduct on the day of Plaintiffs' arrests. A Dallas Morning News ("DMN") article specifically described the arrests of Plaintiffs Verastique, Morse, and Nevills. Members of the public and some Defendant City of Dallas City Council members raised serious questions about how the Defendant City of Dallas handled the protests. In the middle of this firestorm, DPD Chief Renee Hall, as Defendant City of Dallas' delegated policymaker in the area of law enforcement, announced that she would retire from her post in November 2020.

97.     The incident drew more media attention at various points over the next year-and-a-half when a grand jury considered charges against Defendant Rudloff, when DPD released bodycam footage to the DMN showing Defendant Rudloff kneeing Plaintiff Nevills in the stomach

while Nevills' hands were behind his back, and when Plaintiff Verastique and Nevills filed complaints with DPD regarding Defendant Rudloff's use of excessive force.[5]

98.    But Verastique and Nevills are not the only members of the public to complain about Defendant Rudloff using excessive force against them. He has been the subject of nineteen department investigations in more than two decades of service, five of which ended in disciplinary action.[6]

99.    In September 2021, the DMN published an article based on numerous police and court documents describing the incidents that triggered these investigations:

A.    In July 1998, Defendant Rudloff allegedly threatened to beat a Black man with a flashlight. According to the sworn statement the man gave to DPD Internal Affairs, Defendant Rudloff told him that he used the flashlight to "beat n-----s in the head."

B.    In October 1998, another complaint alleged that Defendant Rudloff choked a driver after stopping her for failure to use a turn signal.

C.    Between 1998 and 2000, another eight complaints were filed against Defendant Rudloff for alleged physical and verbal abuse.

D.    In January 1999, after responding to a disturbance call involving a man with a gun, Defendant Rudloff handcuffed an unarmed Black man, allegedly striking him with the palm of his hand and choking him.

---

[5] Miles Moffeit & Cassandra Jaramillo, *Grand jury to weigh criminal charges against Dallas officer who fired pepper balls at protester*, THE DALLAS MORNING NEWS (Nov. 12, 2021) https://www.dallasnews.com/news/investigations/2021/11/12/grand-jury-to-weigh-criminal-charges-against-dallas-officer-who-fired-pepper-balls-at-protester/.
[6] Moffeit et al. *supra* note 4.

E.  Two separate complaints and accompanying federal lawsuits were filed against Defendant Rudloff in 1999, alleging two separate instances in which Defendant Rudloff assaulted Black men with his flashlight.

F.  In November 1999, Defendant Rudloff beat Keith Burkins so severely with a flashlight that Burkins required seven staples in his head. A senior corporal who witnessed the assault reported Defendant Rudloff to a supervisor, but Defendant Rudloff denied any wrongdoing and claimed Burkins hit his head on a sidewalk. DPD investigated the allegations for nine months, during which time Defendant Rudloff was allowed to stay on patrol, and although investigators concluded that Defendant Rudloff was "untruthful" both in an account given to his supervisor and in his written statement, the sum total of DPD's disciplinary action against Defendant Rudloff was to place him on a ten-day unpaid suspension.

G.  In 2002, Defendant Rudloff was accused of racial profiling when he frisked a Black man waiting at a bus stop, allegedly telling the man that he was being searched because Defendant was looking for a Black suspect and he was Black.

H.  In 2005, Defendant Rudloff was sued in his individual capacity for assault and battery of and use of excessive force against Bret Poat.[7] Poat, the plaintiff, alleged that two officers who transported him from the scene of his arrest (one of whom the City identified as Defendant Rudloff) assaulted him by repeatedly striking his face and battering him with a

---

[7] Orig. Cpt., ECF 1, *Poat v. Scroggins* (Dec. 28, 2005, N.D. Tex.) (No. 3:05-cv-2516).

nightstick. Two weeks before the case was scheduled for trial on the assault and battery and excessive force claims, it was settled.

I.  In 2009, after his promotion to sergeant, Defendant Rudloff was yet again accused of excessive force when he and other officers allegedly slammed a man's head into the ground while arresting him for public intoxication.

J.  In 2012, Defendant Rudloff and two other officers fatally shot a carjacking suspect, firing about thirty rounds into his car. Defendant Rudloff was "admonished" by a supervisor after the shooting for violating DPD policy by using a firearm for which he was unqualified.

K.  And in 2018, Defendant Rudloff was "rebuked" for "making a lewd comment about a dead woman in a conversation over a police radio with other officers."

L.  Despite the numerous and near-continuous allegations lodged against Defendant Rudloff throughout his 20-plus year career, the DPD's ten-day suspension for the incident involving Burkins, according to the article, is the most significant disciplinary consequence the DPD has imposed on Defendant.

100.    Rather than discipline or terminate Defendant Rudloff, Defendant City of Dallas, through the DPD, has showered him with praise. Defendant Rudloff was promoted to senior corporal in 2003, then to sergeant in 2007. Upon information and belief, the City of Dallas' failure to discipline Defendant Rudloff for constitutional violations is a common practice or custom among its treatment of DPD law enforcement officers.

101.    Consistent with this pattern of failed discipline, Chief Hall allowed Defendant Rudloff to supervise law enforcement activities at the George Floyd Protests in May 2020. The decision to allow Defendant Rudloff to operate at the George Floyd protests was deliberately indifferent to the known history of Defendant Rudloff's actions and created a substantial likelihood of further constitutional violations, which then occurred.

102.    Subsequently Defendant City of Dallas, through the DPD, again backed Defendant Rudloff in the face of investigations stemming from protester complaints about Defendant Rudloff's actions during the George Floyd protests.

103.    According to the DMN, DPD closed a criminal investigation into Defendant Rudloff's use of excessive force against Verastique without a public statement or any notice given to the Dallas Office of Community Police Oversight.

104.    As of the filing of this Original Complaint, it is unclear whether any internal affairs investigation regarding Defendant Rudloff's conduct is ongoing, and DPD has only spoken about Defendant Rudloff's conduct during the 2020 protests in response to questions from the news media.

105.    Defendant City of Dallas' Charter gives the Defendant City of Dallas the power to "make and enforce all polices . . . regulations, and pass such ordinances as may be expedient for maintaining and promoting the peace, good government, and welfare of the city, for the performance of the functions thereof." City Charter, Ch. II, § 1(31). The charter further delegates official policymaking authority for the treatment of law enforcement officers to the DPD Chief of Police through providing "the right to discipline any of the officers or employees who may be under the chief's jurisdiction and control for violations of city ordinances or federal or state law,

or for failure to obey orders given by the proper authority, or the orders, rules, and regulations promulgated by the chief of police."

106.    DPD's failures to discipline Defendant Rudloff after allegations upon allegations of constitutional violations thus represented Defendant City of Dallas' official policymaking in this area. Further, Defendant Rudloff was kept on the force. Following this failure to discipline, several successive DPD chiefs did not properly address these serious incidents through DPD's official disciplinary system.

107.    Defendant City of Dallas' Charter further delegates official policymaking in the area of law enforcement to the DPD Chief of Police through the adoption of DPD General Orders. See Zarnow v. City of Wichita Falls, 614 F.3d 161, 167 (5th Cir. 2010) (quoting Bennett v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984)) (holding that home-rule city's police department's general orders decide the goals for a home-rule city in the area of law enforcement and devise the means of achieving those goals; and thus indicate the delegation of official policymaking authority).

108.    This authority is further laid out in a recent audit of the DPD complaint process, which describes its ability to influence the disciplinary process through the creation of an Office of Community Police Oversight to monitor DPD Internal Affairs Division investigations.

109.    However, in creating the office, Defendant City of Dallas' City Council failed to give the Office of Community Police Oversight  serious authority or input into the disciplinary process, as evidenced by the fact that OCPO were not kept updated about the DPD's recent investigation into Defendant Rudloff, or even informed when the criminal case against him had been dismissed. As a result, there is no substantial oversight of the DPD or the DPD Chief in this area.

27

110.    The DPD Chief of Police thus failed to properly supervise Defendant Rudloff. Its supervision policies were clearly inadequate as evidenced by the nearly 20 incidents described in this Complaint. The need for more or different supervision would have been obvious to Chief Hall at the time of protests, and the failure to discipline prior to the day of the protests was substantially likely to result in constitutional violations putting citizens at risk.

111.    The closure of DPD's criminal investigation into Defendant Rudloff and DPD's continued failure to disclose relevant information to the Defendant City of Dallas' Office of Community Police Oversight regarding investigations into Defendant Rudloff's conduct together suggest that Defendant City of Dallas, under the DPD, will continue to avoid holding Defendant Rudloff accountable for his unconstitutional actions.

112.    DPD continues to cover up for Defendant Rudloff's wrongdoing, denying justice to his victims, and refuses to take accountability for its own failures in training and communication that led to the disastrous events of the protest weekend, including Plaintiffs' arrests.

**G. DPD, on behalf of Defendant City of Dallas, Failed to Train its Officers Before the Floyd Protests or Adopt Policies**

113.    Press coverage, DPD's limited statements issued in response to such coverage, and DPD reports collectively show how DPD, under delegated official policymaker Chief Hall, failed to adequately train officers or adopt policies in a number of crucial areas before the protests and before Plaintiffs' arrests.

114.    In August 2020, DPD issued a final After-Action Report ("AAR") to assess the DPD's overall performance during the protests and to analyze the multiple ways that lack of training and policies created the perfect storm of chaos in DPD actions during the weekend of the protests.

28

115.    The AAR is defined as a "critical self-analysis intended to inspire concrete steps for organizational growth and development" that assesses "errors, miscalculations, and shortcomings" in accordance with the National Police Foundation standard for after action reporting.

116.    The AAR highlights several areas in which the DPD's actions during the protest weekend were deficient, and draws attention to several major gaps in DPD policy and training that existed at the time of Plaintiffs' arrests.

117.    DPD failed to include the rules of engagement in its Operational Plans for May 29 and May 30 (the day Plaintiffs were arrested), indicating that DPD failed to provide its officers with any guidance on the rules of engagement or necessary policies before arming those officers, including Defendant Rudloff, with multiple forms of chemical weapons munitions and sending them out to conduct mass arrests during protests.

118.    The AAR also concedes that DPD officers and supervisors clearly had not received sufficient prior training, acknowledging that "it was clear to Field Commanders that regular and reoccurring training on Mobile Field Force Tactics is needed" as "officers and supervisors . . . appeared unsure as to the best tactics during officer/protester encounters."

119.    The AAR further details DPD's subsequent adoptions of changes to DPD's use-of-force policies after the criticism it received in the wake of the protests. Chief Hall specifically adopted General Order 902.02 (restricting the use of PepperBall launchers into a crowd), General Order 908.04 (restricting the use of the 40 m.m. "Stinger" into a crowd), and General Order 901.02 (establishing an officer's duty to intervene on the behalf of an individual subjected to unlawful or unnecessary force).

120.     After significant public outrage following the visible, repeated deployment of CS gas against protesters on the Margaret Hunt Hill Bridge, DPD also revised its policy on CS gas use, stating that in future, CS gas would not be used to direct crowd movements and would only be deployed at the direction of the Chief Hall or her designee.

121.     Further, by the day of Plaintiffs' arrests, marches and demonstrations had been occurring throughout major cities with a history of police misconduct for at least three consecutive days. Defendants were thus put on notice of the nature and actions of the protests prior to May 30, 2020. In failing to train its officers to manage protests similar to those which had already begun in Atlanta, Chicago, Los Angeles, Washington, D.C., New York, Detroit, and St. Louis, DPD demonstrated careless indifference for the constitutional rights of protesters and members of the press who sought to exercise those rights during protests in Dallas.

122.     These after-the-fact changes, subsequent adoption of polices, public acknowledgment of failures to train, and the actual notice of other protests throughout the country strongly indicate that at the time of Plaintiffs' arrests, DPD failed to train its officers, including the Defendant Officers, with regard to mass arrests, officer engagement with protesters, and the use of chemical weapons and other so-called "less lethal" munitions. As a result, Chief Hall had actual knowledge and notice of the need to adopt such policies and training at the time of the protests in order to avoid the likely consequence of constitutional violations by DPD officers and the Defendant Officers.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Excessive Force)**
**(As to Defendants Rudloff, Barrett, and Weltman)**

123.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

124.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from excessive use of force that violated Plaintiffs' clearly established constitutional rights, and were not objectively reasonable under the circumstances.

125.    Use of force violates the Fourth Amendment when an injury results (i) directly and only from the use of force that was clearly excessive to the need, and (ii) the force used was objectively unreasonable. See *Hale v. City of Biloxi, Mississippi*, 731 Fed. Appx. 259, 262 (5th Cir. 2018) (citing *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam)).

126.    It is well established that the reasonableness of an excessive force inquiry is confined to the exact moment that resulted in the officer's use of force; and evaluated through (i) severity of the crime at issue, (ii) whether there was an immediate threat to the safety of the officers or others, and (iii) whether there is active resisting of arrest or attempting to evade arrest by flight. *See id.* (citing *Brown v. Lynch*, 524 Fed.Appx. 69, 80 (5th Cir. 2013) (per curiam)); *see also Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (citing *Rockwell v. Brown*, 664 F.3d 985, 992-93 (5th Cir.2011)).

127.    The injuries the Plaintiffs suffered, directly and only from Defendants' use of force was objectively unreasonable. At the moment of the use of force, none of the Plaintiffs were an immediate threat to the Defendants or actively resisted arrest. Nor was the use of force proportional

to the severity of any crime at issue as, ultimately, Plaintiffs were found to have conducted no criminal acts.

128.    Defendants' conduct violated Plaintiffs' clearly established constitutional right to be free from excessive force without a serious or significant threat or active resisting of arrest at the moment of force. *See Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir.2018) ("We have previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest.")

129.    As a result of Defendants' use of excessive force, Plaintiffs suffered a wide range of significant injuries to their bodies, from full body bruising to significant bleeding.

130.    Defendants further acted with evil motive or intent and/or reckless and callous indifference to Plaintiffs' Fourth Amendment rights, entitling Plaintiffs to punitive damages.

131.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
### (Unlawful Arrest)
### (As to Defendants Rudloff, Barrett, Weltman, Pillar and Hoffman )

132.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

133.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from unreasonable search and seizure including unlawful detention, seizure, and arrest that is not supported by a warrant, probable cause, or reasonable suspicion that Plaintiffs had engaged in, was engaging in, or was about to engage in any criminal conduct.

134.    On May 30, 2020, Defendants did not establish probable cause to arrest  Plaintiffs for either obstruction of a highway or riot participation.

135.    At all relevant times, Plaintiffs did not commit a crime and Defendants did not have probable cause or reasonable suspicion to believe Plaintiffs had engaged in, were engaging in, or were about to engage in any criminal conduct.

136.    Defendants' conduct violated Plaintiffs' clearly established Fourth Amendment rights, of which Defendants knew, or of which a reasonable police officer should have known, thereby making Defendants liable under 42 U.S.C. § 1983.

137.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered damages, including mental anguish, professional injuries, and damage to their reputation. Plaintiffs continue to experience anxiety and fear of police, knowing that at any point, without probable cause, their freedom could be taken away.

138.    Defendants further acted with evil motive or intent and/or reckless and callous indifference to Plaintiffs' Fourth Amendment rights, entitling Plaintiffs to punitive damages.

139.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
### (Malicious Prosecution)
### (As to Defendants Rudloff, Barrett, Weltman, Pillar and Hoffman )

140.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

141.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from malicious prosecution, and that violated Plaintiffs' clearly established constitutional rights.

142.    The institution of criminal charges or proceedings violates the Fourth Amendment when (i) the motive in instituting the suit was without probable cause and for a purpose other than

33

bringing a person to justice, and (ii) the legal charges or proceedings are terminated or ended without a conviction. *See Thompson v. Clark,* 141 S.Ct. 1332, 1338-41 (2022).

143.    The arrests of the Plaintiffs by Defendants led to the institution of criminal legal charges against the Plaintiffs for obstruction of a roadway or for riot participation. However, Defendants' institution of criminal charges were done without particularity and without probable cause. In addition, Defendants' institution of legal charges only served to punish Plaintiffs for protesting against law enforcement, rather than bringing Plaintiffs to justice.

144.    Plaintiffs were then subjected to an unlawful pretrial detention at the start of the legal process, and legal proceedings that wronged Plaintiffs' characters and reputations.

145.    All of the criminal charges that were instituted by Defendants were subsequently dropped or terminated without convictions.

146.    Defendants' conduct therefore violated Plaintiffs clearly established constitutional rights to be free from the initiation of criminal proceedings resulting in seizure and unlawful pretrial detention without probable cause. *See id.* at 1337; *see also Manuel v. Joliet*, 580 U.S. 357, 363 (2017).

147.    As a result of Defendants' malicious prosecution, Plaintiffs suffered damages, including mental anguish, professional injuries, and damage to their reputations. Plaintiffs experienced fear for their personal health and safety while confined in close proximity to other arrestees at the height of the COVID-19 pandemic, and continue to experience anxiety and stress related to their detention.

148.    Defendants further acted with evil motive or intent and/or reckless and callous indifference to Plaintiffs' Fourth Amendment rights, entitling Plaintiffs to punitive damages.

149.    Plaintiffs' requests for relief are set forth below.

**AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability – Malicious Prosecution & Unlawful Arrest)**
**(As to Defendant City of Dallas)**

150.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein

151.    Defendant City of Dallas deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from malicious prosecution and unreasonable search and seizure.

152.    Defendant City of Dallas' written mass arrest policies under DPD's General Orders were facially unconstitutional and encouraged deprivations of the Fourth Amendment right to be free from malicious prosecution and unreasonable search and seizure.

153.    DPD Chief of Police Renee Hall, as the delegated official policymaker in this area, created and promulgated Defendant City of Dallas' written mass arrest policies.

154.    Defendant City of Dallas' written mass arrest policies did not account for the significant likelihood that mass arrests would occur without proper findings of probable cause, specifically  DPD General Order 609.00 failed to provide any checks to ensure arrests had probable cause beyond the simple approval of arrests by a Patrol Division Investigative Unit, or with Misdemeanors, on-site approval by an Investigative Unit Supervisor. Further, DPD General Order 609.00 did not provide any guidance or restrictions on arrests as it allowed officers to conduct arrests as they saw necessary to "quell a civil unrest incident."

155.    As a result, Defendant's official mass arrest policies advance arrests without the necessary finding of probable cause; thereby causing unreasonable search and seizure and the initiation of criminal charges without probable cause. The official mass arrest policies also encourage DPD officers to use arrests as a means to shut down any civil protests without any

35

restriction, thereby significantly increasing the likelihood of unconstitutional actions by arresting officers.

156.    Therefore, Defendant City of Dallas' official mass arrest policies advanced and encouraged actions that are directly in defiance of well-established law. *See Thompson v. Clark,* 141 S.Ct. 1332, 1338-1341 (2022); *see also Johnson v. Thibodaux City*, 887 F.3d 726, 735 (holding that without a crime, there was no probable cause to arrest).

157.    A municipality's policies that ignore well-settled interpretations of the constitutional rights are facially unconstitutional. *See Monell v. Dep't of Social Servs*., 436 U.S. 658 (1978). Therefore, Defendant's official mass arrest policies are facially unconstitutional, and instruct Defendant's officers to act unconstitutionally.

158.    Defendants Rudloff, Barrett, Weltman, Pillar and Hoffman acted on Defendant City of Dallas' facially unconstitutional policies through arresting Plaintiffs without probable cause and instituting criminal charges without probable cause that were ultimately dismissed.

159.    Defendants Rudloff, Barrett, Weltman, Pillar and Hoffman, encouraged and emboldened by Defendant City of Dallas' facially unconstitutional policies, greatly increased the likelihood of Plaintiffs' injuries.

160.    As a result, Defendant City of Dallas' official mass arrest policies were a moving force behind the deprivations of Plaintiffs' constitutional rights.

161.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF
### 42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
### (Municipal Liability – Denial of Basic Human Needs)
### (As to Defendant Dallas County, Dallas County Sheriff's Office, City of Dallas)

162.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

163.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment right to be free from punishment and the right to basic human needs.

164.    Defendants Dallas County, Dallas County Sheriff's Office, and City of Dallas (collectively "Municipal Defendants") were deliberately indifferent to the events where officers denied medical treatment, delayed medical treatment, or ignored basic human needs, and, therefore Defendants encouraged deprivations of the Fourteenth Amendment right to be free from punishment and the right to medical care as a pretrial detainee.

165.    Municipal Defendants' delegated official policymakers in this area, approved, ratified, and promulgated the practice or custom of violating the right to basic human needs with objective deliberate indifference.

166.    Municipal liability in an episodic act or omissions case requires establishing that (i) the municipal employee[s] violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (ii) that the violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference. *See Garza v. City of Donna,* 922 F.3d 626, 634 (5th Cir. 2019) (citing *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008)).

167.    The actions of Municipal Defendants' officers in the DPD police van and the Dallas County Jail violated Plaintiffs' clearly established constitutional rights to basic human needs with subjective indifference, as the officers had actual knowledge of the complaints of Plaintiffs and their basic human needs, but wantonly ignored them.

168.    A municipal policy or custom adopted and maintained with objective deliberate indifference may be inferred from (i) a pattern of constitutional violations or (ii) a single incident

with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights. *See id.* at 638-39 (citing *Littell v. Houston Indep. Sch. Dist.,* 894 F.3d 616, 624 (5th Cir. 2018)).

169.    The numerous complaints, reported incidents, and widespread denial of basic human needs in the DPD vans and at the Jail during the George Floyd protests represent a single extreme incident with proof of a high likelihood of recurring in future situations where Municipal Defendants incarcerate persons arrested within a mass-arrest event.

170.    The adoption of the custom or practice of denying basic human needs allowed by Municipal Defendants denied the opportunity to treat Plaintiffs for their injuries or to provide Plaintiffs with things necessary for their continued wellbeing. Ultimately, it allowed for the officers at the jail to punish Plaintiffs unlawfully as pretrial detainees.

171.    Municipal Defendants' custom or practice of denying of basic human needs was thus a moving force behind Plaintiffs' injuries and the deprivations of their constitutional rights.

172.    Plaintiffs' requests for relief are set forth below.

**AS AND FOR A SIXTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Failure to Adopt Policies and Training)**
**(As to Defendant City of Dallas)**

173.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

25.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment rights afforded to individuals.

174.    Defendant City of Dallas failed to adopt policies or training regarding the appropriate use of force against protesters, use of chemical weapons, and mass arrest procedures.

38

175.    Defendant City of Dallas had actual knowledge and notice of the need to adopt such policies and training because of similar protests which had already begun in Atlanta, Chicago, Los Angeles, Washington, D.C., New York, Detroit, and St. Louis, the City. In addition, the subsequent policies adopted by DPD Chief Hall, as a result of constitutional violations at the protests, further evidenced the need to adopt such policies and training prior to the protests.

176.    As a result, it was obvious to Defendant City of Dallas that the likely consequences of failing to adopt such policies and training would deprive individuals of their constitutional rights, especially in regard to the use of force and to arrests conducted without probable cause.

177.    When the likely consequence of a municipality failing to adopt a policy is the deprivation of constitutional rights; then the municipality can be deliberately indifferent to the constitutional violations by its officers. *See Porter v. Epps*, 659 F.3d 440, 447 (5th Cir. 2011). Further, a municipality is deliberately indifferent when it has actual or constructive notice that a failure to adopt a policy or conduct training would violate constitutional rights. *See id.* (citing *Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011)).

178.    Defendant City of Dallas' deliberate indifference to adopt appropriate policies or training led to the aggressive responses by DPD officers and the Defendant Officers against Plaintiffs through the use of excessive force against Plaintiffs, and the arrests without probable cause.

179.    As a result, Defendant City of Dallas' failures to adopt necessary training and policies regarding the appropriate use of force against protesters, use of violent chemical weapons, and unlawful mass arrest procedures had a causal factor in Plaintiffs' deprivations of constitutional rights, and thus, were a causing factor for Plaintiffs' injuries.

180.    Plaintiffs' requests for relief are set forth below.

**AS AND FOR A SEVENTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability - Failure to Discipline)**
**(As to Defendant City of Dallas)**

181.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

182.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment rights afforded to be free from excessive use of force, malicious prosecution, and unreasonable search and seizure.

183.    Establishing municipal liability for a failure to discipline requires (i) a supervisor failed to discipline a subordinate official, (ii) a causal link exists between the failure to discipline and the violation of constitutional rights, and (iii) the failure to discipline amounts to deliberate indifference. *See Edwards v. Oliver,* 2019 WL 4603794 at *13 (N.D. Tex. 2019) (citing *Livezey v. City of Malakoff,* 657 F. App'x 274, 278 (5th Cir. 2016)).

184.    Deliberate indifference in this context requires (i) a pattern of similar actions by a final policymaker to fail to discipline constitutional violations by employees, or (ii) a single incident of a final policymaker failing to discipline extreme constitutional violations. *See Edwards v. Oliver,* 2019 WL 4603794 at *13 (N.D. Tex. 2019) (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)).

185.    Defendant City of Dallas' pattern of failing to discipline constitutional violations by employees can be inferred from the failure to discipline Defendant Rudloff for his numerous constitutional violations over his long career with the DPD.

186.    The numerous failures to discipline constitutional violations by Defendant City of Dallas, through the DPD, indicate a pattern of similar actions by DPD in failing to discipline

employees, and indicate that the failure to discipline is not limited to isolated instances, or to Defendant Rudloff.

187.    In addition, the DPD's failure to discipline any of the employees responsible for the constitutional violations during the George Floyd Protests is sufficient to establish the deliberate indifference single-incident exception. Specifically, the following indicate that the events were sufficient to establish the exception: (i) the extreme and widespread violations of Fourth Amendment during the protests, (ii) the subsequent inadequate investigations done by the DPD, (iii) the intensive news coverage of the constitutional violations and unlawful acts that occurred during the protests, and (iv) the DPD's public acknowledgement of the extreme violations.

188.    As a result of these patterns and the single incident exception, DPD, on behalf of the City of Dallas, was deliberately indifferent to the violations of the Fourth Amendment that would occur from their failure to discipline.

189.    The consequence of this failure to discipline employees was an environment in which Defendant Rudloff, or the other Defendant Officers, felt they could act with impunity towards Plaintiffs and their constitutional rights.

190.    Defendant City of Dallas' failure to discipline violations of the Fourth Amendment rights afforded to persons allowed for DPD officers to willfully and wantonly deprive Plaintiffs of their constitutional rights without any fear of reprisal, discipline, or consequences.

191.    As a result, Defendant City of Dallas' failure to discipline was a cause of the injuries suffered by Plaintiffs, and the deprivations of their constitutional rights.

192.    Plaintiffs' requests for relief are set forth below.

**AS AND FOR AN EIGHTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability - First Amendment Deprivations)**
**(As to Defendant City of Dallas)**

193.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

194.    The conduct alleged herein deprived Plaintiffs of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the First Amendment right to peaceful assembly and free speech.

195.    Defendant City of Dallas, through the DPD, adopted a policy and/or practice of suppressing Plaintiffs' rights under the First Amendment by arresting them for lawfully protesting, intimidating them, and using violence against them. Defendant used mass arrests, excessive force, and mass intimidation to discourage protestors from exercising their First Amendment rights. As alleged above, protestors were repeatedly told "you should have stayed home" and that "you were holding a sign" was the reason they were being arrested.

196.    As evidence of a policy and/or practice adopted by the Defendant City of Dallas, the August 14, 2020 After-Action Report presented by delegated policymaker Chief Hall, wholly approved the actions of the officers. In the "Moving Forward" section of the Report on page 45, no mention is made of any policy adjustments to ensure that citizens exercising their rights in the future are not arrested *en masse* by officers telling them that their protesting is the reason they are being arrested. In fact, the Report only expressed substantive disapproval of the message of the protest itself, complaining of the "hateful words" spoken by protestors.

197.    The policy delineated above was actually known, constructively known and/or ratified by Defendant City of Dallas, and was promulgated by Chief Hall with deliberate indifference to Plaintiffs' rights under the Unites States Constitution. The known and obvious

42

consequence of the policy delineated above was that DPD officers would be using various tactics to discourage free speech and the exercise of First Amendment rights, including excessive force, mass arrests, and speech-chilling intimidation. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

198.    Consequently, the policy above was the moving force of Plaintiffs' constitutional deprivations and injuries, causing the injuries described.

199.    Plaintiffs' requests for relief are set forth below

### AS AND FOR A NINTH CAUSE OF ACTION FOR A VIOLATION OF
TEX. CIV. PRAC. & REM. CODE 101.025(a)
(Tort Liability)
(As to Defendant City of Dallas, Rudloff, Barrett, Weltman, Pillar and Hoffman)

200.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

201.    The conduct alleged herein resulted in Plaintiffs suffering injuries arising out of the Defendant Officers' wrongful acts, omissions, and/or negligence.

202.    Defendant Officers acted within the scope of their employment under Defendant City of Dallas as DPD officers, at the time that Defendant Officers caused Plaintiffs' bodily injuries.

203.    Defendant Officers used tangible property, including chemical weapons, restraints, and DPD vehicles, to cause Plaintiffs' injuries.

204.    Plaintiffs' requests for relief are set forth below.

### JURY DEMAND

205.    Plaintiffs demand a jury trial of all claims in the Complaint on which a jury trial is available.

## **PRAYER**

**WHEREFORE**, Plaintiffs respectfully pray that this Court grant the following relief:

A.  A monetary judgment awarding Plaintiffs actual damages for their mental anguish, professional injuries, and damage to their reputations;

B.  An award of punitive damages against the Defendants, ;

C.  Injunctive relief for the unconstitutional polices and failures to discipline or train;

D.  An award of costs and attorney's fees;

E.  Pre- and post-judgment interest; and

F.  Such other and further relief to which Plaintiffs are justly entitled.

Dated: May 31, 2022                                    Respectfully submitted,

*/S/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@equalrights.law
Sebastian Van Coevorden
Texas State Bar No. 24128101
svancoevorden@equalrights.law
**ELLWANGER LAW LLLP**
400 S. Zang Blvd. Ste. 600
Dallas, TX 75208
Telephone: (469) 998-6775
Facsimile: (469) 998-6775

***Counsel for Plaintiffs***